The **PEOPLE** of the State of Colorado,
Plaintiff–Appellant,

v.

Philander Knox **RATCLIFF**,
Defendant–Appellee.

No. 88SA351.

Supreme Court of Colorado,
En Banc.

Sept. 18, 1989.

**1372**

Barney Iuppa, Dist. Atty., and Gordon R. Denison, Deputy Dist. Atty., Colorado Springs, for plaintiff-appellant.

Michael Morris, Colorado Springs, for defendant-appellee.

Chief Justice QUINN delivered the Opinion of the Court.

In this interlocutory appeal the People challenge a ruling of the district court suppressing a plastic vial containing cocaine, which a police officer took from the defendant during a pat-down search of his person, and also other physical and verbal evidence obtained subsequent to the seizure of the cocaine. The district court ruled that there was not probable cause to arrest the defendant and that, even though the officer validly stopped and temporarily detained the defendant, the officer's seizure and examination of the contents of the closed plastic vial exceeded the limits of a permissible protective search for a weapon. We affirm the suppression ruling, but do so for reasons different from those relied upon by the district court.

## I.

The defendant, Philander Ratcliff, is charged with possession and distribution of a schedule II controlled substance, namely cocaine. §§ 12–22–310, 5 C.R.S. (1985 & 1988 Supp.), and 18–18–105, 8B C.R.S. (1986 & 1988 Supp.). After entering a plea of not guilty, the defendant filed a motion to suppress physical evidence taken from his person, as well as a custodial statement made by him to police, on the basis that he was subjected to an unlawful arrest or detention and that the challenged evidence was the product of unconstitutional police conduct. A suppression hearing conducted by the district court established the following facts.

At approximately 7:30 p.m. on June 2, 1988, Detective Quinton Turner of the Colorado Springs Metro Narcotics Unit was engaged in an undercover operation near a bar called the Cloud Nine Lounge in Colorado Springs. The bar was located in an area that had a history of high drug activity. As Detective Turner drove slowly past the bar in an unmarked vehicle, he saw Ernest Walker, whom he knew as a user and seller of cocaine and for whom there was an outstanding arrest warrant, standing in the area outside the bar. The defendant at this time came out of the lounge and made contact with Walker. Detective Turner described the contact as follows: the defendant walked up to Walker, and Walker extended one hand out to the defendant; the defendant then put his hand out and Walker took something from him, and the defendant, in turn, took something from Walker; as this apparent exchange took place, the defendant and Walker remained close to the side of the building, as if they were attempting to shield their conduct from view.

When Detective Turner made these observations he was approximately twenty to forty feet from the two men. Although the detective was unable to see what objects actually had been exchanged between the defendant and Walker, he believed that they had engaged in a drug transaction and radioed other officers for assistance. He wanted these officers to arrest Walker on the outstanding arrest warrant and also to make a pat-down search of the defendant to determine if he had actually received drugs from Walker.

Officers Spitzmiller and McDonald went to the parking lot of the Cloud Nine Lounge to assist Detective Turner in connection with the alleged drug transaction.

The officers arrived in a police vehicle within a few minutes, and Detective Turner pointed out Walker and the defendant to the officers. As Officers Spitzmiller and McDonald entered the parking lot, the defendant began to move away from Walker. Officer Spitzmiller stopped the defendant, and Officer McDonald intercepted Walker. Officer Spitzmiller testified at the suppression hearing that he had frequently recovered weapons from suspects during investigatory stops and, hence, he conducted a pat-down search of the defendant for his own safety and also to recover any narcotics on the defendant's person before the defendant attempted to destroy them.

In conducting the pat-down search, Officer Spitzmiller asked the defendant to place his hands on the police vehicle. After the defendant complied with this request, the officer patted down the defendant and felt a "large solid object" in the defendant's pocket. Being unable to determine what the object was, Officer Spitzmiller reached into the pocket and recovered a closed plastic vial wrapped with gray duct tape. The vial had a flip-top lid and, according to the officer, was approximately three inches long, one and one-half inches wide, and one-half inch thick. The officer described the vial as "something like a Tic–Tac box" —an apparent reference to a plastic container in which Tic–Tac candies are sold.

Officer Spitzmiller acknowledged at the suppression hearing that he did not consider the vial as a threat to his own safety. Because he had no idea what might be inside the vial and could not see its contents, he opened the lid and observed "cocaine rocks" inside. The officer testified that under the circumstances he would have opened the vial regardless of what it appeared to be. Upon observing the co-

caine inside the vial, Officer Spitzmiller handcuffed the defendant and placed him under arrest for possession and distribution of cocaine. The defendant was thoroughly searched at the scene of the arrest, and $186 was recovered from his pocket. Upon being transferred to the stationhouse, the defendant was advised of his *Miranda* rights and, after waiving those rights, admitted to Detective Turner that he had cocaine with him at the time of his arrest.[1]

At the conclusion of the suppression hearing, the district court initially denied the motion to suppress on the basis that Detective Turner's observations of the actions of the defendant and Walker outside the lounge constituted probable cause to believe that a drug transaction had taken place and thus justified the arrest of the defendant and the search of his person as incident to the arrest.[2] The court also ruled that if its determination of the probable cause issue was erroneous, the seizure of the plastic vial was not justified as part of a valid "stop and frisk." The court reasoned that, although there were specific and articulable facts supporting the stop of the defendant, Officer Spitzmiller's search of the defendant's pockets for the purpose of determining if the defendant had drugs on his person was not a constitutionally reasonable purpose for a pat-down search. The court also ruled that the defendant was fully advised of his *Miranda* rights and knowingly and voluntarily waived those rights in admitting that he had cocaine with him at the time of his arrest. Three days after its initial ruling, the district court reconsidered the suppression motion *sua sponte* and granted the motion, ruling that there was insufficient evidence to support a finding of probable cause for

---

1. Prior to being transferred to the county jail, an additional $200 was recovered from one of the defendant's socks.

2. The court based its probable cause determination on the following findings: that Detective Turner, while cruising the area at a low rate of speed, saw what he described as a hand transaction which he believed to be a drug transaction

between the defendant and Walker; that the detective saw the defendant hold out his hand and Walker take something from the defendant; that he saw Walker hold out his hand and the defendant take something from Walker; and that the detective believed that the defendant and Walker were trying to hide themselves or make themselves as inconspicuous as possible during the exchange.

the defendant's arrest,[3] and reaffirming its prior ruling that the seizure of the plastic vial was not part of a valid "stop and frisk."

In urging reversal of the suppression ruling, the People raise two alternative arguments. The People initially argue that Detective Turner's observations of the defendant and Walker outside the Cloud Nine Lounge constituted probable cause for the defendant's arrest and thus supported the seizure of the plastic vial from the defendant's person and the examination of its contents as a search incident to a valid arrest. The People alternatively contend that, even in the absence of probable cause to arrest, there was at the very least a specific and articulable basis in fact for stopping the defendant and conducting a pat-down search, and that the examination of the contents of the plastic vial was constitutionally justified as part of a protective search for a weapon, with the result that the additional information obtained in the course of the examination of the vial satisfied the standard of probable cause for an arrest.

## II.

Both the Fourth Amendment to the United States Constitution and its Colorado counterpart, Colo. Const. art. II, § 7, require that an arrest be based on probable cause. *E.g., Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *People v. Vigil*, 198 Colo. 185, 597 P.2d 567 (1979); *People v. Saars*, 196 Colo. 294, 584 P.2d 622 (1978). The constitutional standard of probable cause serves two functions. It not only protects citizens from "rash and unreasonable interferences with privacy," but also gives "fair leeway for enforcing the law in the community's protection." *Brinegar*, 338 U.S. at 176, 69 S.Ct. at 1311; *see People v. Hearty*, 644 P.2d 302, 309 (Colo.1982).

An officer has probable cause to arrest a suspect when the officer has reasonable grounds to believe that the suspect has committed or is committing a crime. *E.g., Brinegar*, 338 U.S. 160, 69 S.Ct. 1302, *People v. Navran*, 174 Colo. 222, 483 P.2d 228 (1971). The "probable cause" standard is not to be measured by a " 'more likely true than false' level of certitude but by a common-sense, nontechnical standard of reasonable cause to believe," with due consideration being given to a police officer's experience and training in determining the significance of his observations to the ultimate issue of probable cause. *People v. Melgosa*, 753 P.2d 221, 225 (Colo.1988); *see People v. Ball*, 639 P.2d 1078, 1082 (Colo. 1982). A custodial arrest based on probable cause is a reasonable intrusion and, as such, needs no additional justification for a

**3.** In its subsequent ruling granting the motion to suppress, the district court stated, in pertinent part, as follows:

Detective Turner testified that he had known Mr. Walker, one of the two parties, prior to that night but the rest of the information was merely suspicious conduct. And while I think it's a very close question, it makes no sense to me since the People can appeal my decision pursuant to an interlocutory appeal and the Defendant can't, that we'd have to go through a trial of this matter, which, from the evidence that I have seen, would be, regardless of the outcome, very straightforward in terms of its approach.

And again I'm not just doing this because I reconsidered the procedural posture of the case. I'll note specifically some additional items ... that I didn't note before. First, the transaction or the exchange between Mr. Ratcliff and Mr. Walker as alleged, Detective Turner saw no money, number one.

Number two, he saw no packet or packaging device which is commonly used for carrying or dispensing of drugs. He had no tip about either of these parties specifically, although he had some general knowledge about Mr. Walker's being an addict and a drug seller, he didn't know anything specifically about Mr. Walker that night. He made no observations of any drug deals by the defendant or Mr. Walker on that night or as testified to on any other night which might assist generally in making a decision about what he was watching or specifically that he might have seen these parties dealing before.

Detective Turner made no representation of any dealing specifically at Cloud Nine that night that he was able to observe. This was the only transaction. And there was no other behavior that night regarding any contact by Mr. Ratcliff with anybody else, Mr. Walker or anybody else which would be of a suspicious nature akin to selling drugs.

full search of the person arrested. *E.g., United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). A search incident to an arrest, therefore, "need not be limited to a mere pat-down of the arrestee's outer clothing, but may extend to pockets and other containers, open or closed, found on the person of the arrestee or within his immediate reach." *People v. Bischofberger,* 724 P.2d 660, 664 (Colo. 1986).

A custodial arrest, of course, is only one form of police intrusion. Other more limited intrusions into the personal privacy or security of the citizen, such as a stop and frisk, may be made on the less exacting standard of "reasonable suspicion." The genesis of "stop and frisk" jurisprudence is *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where the United States Supreme Court held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

392 U.S. at 30–31, 88 S.Ct. at 1884–85; *see also Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). *Terry* makes clear that a self-protective search for weapons, unlike a search incident to a lawful arrest, "is not justified by any need to prevent the disappearance or destruction of evidence of crime." 392 U.S. at 29, 88 S.Ct. at 1884. On the contrary, the sole justification for a so-called weapons frisk is

"the protection of the police officer and others nearby." *Terry,* 392 U.S. at 29, 88 S.Ct. at 1884; *see* § 16–3–103(2), 8A C.R.S. (1986) (peace officer making investigatory stop may conduct pat-down search for weapon when officer reasonably suspects that his personal safety requires it).

Following *Terry,* our case law has consistently acknowledged that intermediate forms of police response short of the traditional arrest and full-scale search—such as a stop for questioning or a frisk for a weapon—may be employed under narrowly defined circumstances on less than probable cause. *E.g., People v. Hughes,* 767 P.2d 1201 (Colo.1989); *People v. Tate,* 657 P.2d 955 (Colo.1983); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971). Three conditions must exist before a person may be subjected to a limited intrusion into personal privacy or security: first, there must be a specific and articulable basis in fact for suspecting that criminal activity has occurred, is taking place, or is about to occur; second, the purpose of the intrusion must be reasonable; and third, the scope and character of the intrusion must be reasonably related to its purpose. *E.g., Hughes,* 767 P.2d 1201; *Melgosa,* 753 P.2d 221; *Tate,* 657 P.2d 955; *see* § 16–3–103(1), 8A C.R.S. (1986) (officer may stop person "who he reasonably suspects is committing, has committed, or is about to commit a crime" and question person about his actions). In assessing the constitutional basis for a limited intrusion on less than probable cause, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880; *see Tate,* 657 P.2d at 958.

■ A valid stop based on reasonable suspicion does not automatically justify a subsequent search for a weapon. A protective search for a weapon is justified only when the circumstances of an otherwise valid stop provide the officer with a reasonable basis to suspect that the person with whom he is dealing may be armed and

dangerous. *Navran*, 174 Colo. 222, 483 P.2d 228; *accord People v. Sherman*, 197 Colo. 442, 593 P.2d 971 (1979); *see* § 16–3–103(2), 8A C.R.S. (1986). While an officer's subjective intent is a relevant factor for a court to consider in determining the purpose of the intrusion, *People v. Cagle*, 688 P.2d 718, 722 (Colo.1984), it is by no means determinative of the issue, and a limited intrusion will be upheld on the basis of its objective reasonableness even though the officer may have harbored a subjective intent to engage in a more extensive intrusion than was otherwise warranted under the circumstances. *People v. LaGrutta*, 775 P.2d 576, 579–81 (Colo.1989); *Hughes*, 767 P.2d at 1205; *Tate*, 657 P.2d at 959–60 (Lohr, J., concurring).

 Controlling principles of "stop and frisk" law also require that the scope and character of a limited intrusion be reasonably related to its purpose. As the United States Supreme Court observed in *Terry*, since the sole justification for a protective search is "the protection of the police officers and others nearby," the search itself must accordingly "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." 392 U.S. at 29, 88 S.Ct. at 1884. Thus, when there is an objectively reasonable basis for the officer's suspicion that the suspect he is dealing with poses a potential danger, a protective search for weapons will pass constitutional muster as long as such intrusion is reasonably related to the purpose of neutralizing the risk of physical harm confronting the officer and others during the investigatory stop. *See Tate*, 657 P.2d at 959; *People v. Martineau*, 185 Colo. 194, 198, 523 P.2d 126, 128 (1974). If a protective frisk is to be effective, the officer conducting the frisk must be permitted to make a cursory, "plain view" examination of any object seized for the purpose of determining whether it indeed is a weapon or some other type of dangerous instrument. *Melgosa*, 753 P.2d at 228. Finally, although probable cause might be lacking at the inception of a limited intrusion, additional facts legitimately discovered by an officer during the course of a limited intrusion may give rise to probable cause to support a custodial arrest. *Hughes*, 767 P.2d at 1207; *Melgosa*, 753 P.2d at 228; *Tate*, 657 P.2d at 959.

### III.

In light of the aforementioned principles, we first consider the People's claim that there was probable cause to arrest the defendant. If probable cause existed for the defendant's arrest, our inquiry is at an end, because a full search of the defendant, including the opening of any containers found on his person, would be constitutionally permissible as incident to his arrest. *E.g., Robinson*, 414 U.S. 218, 94 S.Ct. 467; *Bischofberger*, 724 P.2d 660. If, on the other hand, probable cause for the defendant's arrest was lacking, we must then consider whether there was a specific and articulable basis in fact for an investigatory stop, and, if there was such a basis, whether the officer was constitutionally permitted to seize the plastic vial, and, finally, whether the officer's act in opening the lid of the vial to examine its contents exceeded the bounds of a constitutionally permissible protective search for a weapon.

### A.

 Probable cause is a fact-specific inquiry that must be resolved on the basis of the totality of circumstances. *See, e.g., Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In light of the fact that probable cause to support a custodial arrest requires more than suspicious circumstances, we are satisfied that probable cause to arrest the defendant did not exist at that point in time when Officer Spitzmiller opened the plastic vial and examined its contents.

 Detective Turner's observations of the defendant and Walker were made in the course of a routine surveillance of the area around the Cloud Nine Lounge and were not based on any prior information that either the defendant or Walker would be engaging in a drug transaction at the time and place in question. The conduct of

the defendant and Walker, viewed objectively, consisted of a brief exchange of some object or objects outside a bar. Although the place where this incident occurred was known to the police as a drug trafficking area, it was nonetheless a public way and people obviously had many reasons for being there other than drug dealing. Moreover, while Detective Turner knew Walker to be a drug user and dealer and also knew that there was a warrant outstanding for his arrest, the detective had no prior knowledge of the defendant and never saw any object actually exchanged between the defendant and Walker. Finally, there is nothing in the behavior of the defendant during the stop and frisk which, when coupled with the facts known to Detective Turner prior to the stop, would give rise to probable cause to arrest the defendant for a crime.[4] The quantum of information known to Detective Turner and Officer Spitzmiller immediately prior to the examination of the contents of the plastic vial, while perhaps sufficient to constitute a reasonable suspicion,

did not rise to the level of probable cause to support a custodial arrest of the defendant and an examination of the contents of any containers found on his person.[5]

### B.

We turn now to the question whether there was reasonable suspicion to make an investigatory stop of the defendant and, if there was, whether Officer Spitzmiller's seizure of the plastic vial was constitutionally permissible, and whether his opening the lid to examine its contents exceeded the limits of a constitutionally permissible protective search for a weapon.

### 1.

 The first condition for a valid investigatory stop is the existence of a specific and articulable basis in fact for suspecting that the person subjected to the stop has engaged in, is presently engaging in, or is about to commit a criminal act. *E.g., Hughes,* 767 P.2d 1201; *Melgosa,* 753 P.2d 221; *Tate,* 657 P.2d 955. We conclude

4. The People argue that even if Officer Spitzmiller lacked probable cause to arrest upon initially stopping the defendant, probable cause was created when the defendant made a furtive gesture during the investigatory stop. We find the People's argument unpersuasive. When Officer Spitzmiller asked the defendant to place his hands on the police vehicle during the pat-down frisk, the defendant lowered his head while being searched and said something like "Geez." We cannot characterize this conduct as "furtive," *see generally People v. Thomas,* 660 P.2d 1272 (Colo.1983), nor can we find anything in it to provide the missing quantum of evidence essential to probable cause.

The People also argue that the recovery of the plastic vial from the defendant's person was an additional factor elevating Officer Spitzmiller's reasonable suspicion to the level of probable cause. We again disagree. While some types of containers might be commonly associated with drug trafficking and thus provide some additional evidence on the issue of probable cause, Officer Spitzmiller merely described the plastic container as small, opaque, and similar to a "Tic–Tac" box and acknowledged that he had "no idea what was inside of it." No testimony was presented at the suppression hearing establishing that the plastic vial in question would be readily identified by a police officer as a drug-carrying container. *cf. Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion) (probable cause for seizure exist-

ed where police officer, in course of routine traffic stop of defendant, observed an opaque, green party balloon, knotted near the tip, fall from defendant's hands to the seat beside his leg, and officer was aware that balloons tied in this manner were frequently used to carry narcotics).

5. The People rely on *United States v. White,* 655 F.2d 1302 (D.C.Cir.1981), and *United States v. Green,* 670 F.2d 1148 (D.C.Cir.1981), to support their contention that Detective Turner's observations of the defendant and Walker provided the detective with probable cause to arrest the defendant. While *White* and *Green* involved police observations of an apparent drug exchange in a high drug-trafficking area, the observations were with binoculars and provided the officers a considerable amount of detail with respect to the objects and persons involved in the exchange and a much higher level of circumstantially incriminating information than that provided by the observations of Detective Turner. We are satisfied that the information known to Detective Turner prior to the stop of the defendant did not provide the detective with such reasonably trustworthy information as "to warrant a prudent man in believing that the [defendant] had committed or was committing an offense," *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964), by making some undetermined exchange with Walker outside the Cloud Nine Lounge.

that the observations by Detective Turner and the information known to him immediately prior to the stop of the defendant, while not amounting to probable cause to arrest, did provide the detective with a reasonable suspicion that the defendant had engaged in a criminal act.

The physical actions between the defendant and Walker, while appearing innocent to a casual observer, took on added significance when considered in the context of Detective Turner's training and experience in drug enforcement. The detective testified that the brief exchange between the defendant and Walker resembled a drug exchange in a public place. The fact that the transaction in question occurred in a place reputed to be a high drug-trafficking area, along with Detective Turner's prior knowledge of Walker as a user and supplier of drugs, provided additional support for an investigatory stop. Although the question is not free from all doubt, *cf. see Sibron v. New York*, 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) ("The inference that persons who talk to narcotics addicts are engaged in criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security."), we are satisfied that Detective Turner had a specific and articulable basis in fact to stop and temporarily detain the defendant and to direct Officer Spitzmiller to effectuate the stop and detention for the purpose of making reasonable inquiries of the defendant regarding his actions.

### 2.

Having determined that the officers could validly stop the defendant and question him regarding his actions, we turn to the second condition for a limited intrusion into personal privacy or security—that is, whether the purpose of the intrusion was reasonable. *Hughes*, 767 P.2d 1201; *Melgosa*, 753 P.2d 221; *Tate*, 657 P.2d 955. The district court concluded that Officer Spitzmiller's seizure of the plastic vial was invalid because one of the officer's purposes in making the stop was to search for and seize any drugs which the defendant might have been carrying on his person. In so ruling, the district court erroneously limited its consideration to the officer's subjective intent rather than the standard of objective reasonableness.

While an officer's subjective intent is a factor which a court may consider in determining whether the purpose of an intrusion was reasonable, *Cagle*, 688 P.2d at 722, it is not critical to a resolution of that question. What is determinative is whether the purpose of the intrusion was reasonable in light of the objective circumstances confronting the officer at the time and place in question. *E.g.*, *LaGrutta*, 775 P.2d at 579–81; *Hughes*, 767 P.2d at 1205; *Tate*, 657 P.2d at 959–60 (Lohr, J., concurring). A police officer making a valid investigatory stop may make a further limited intrusion into the personal privacy or security of the suspect so long as the purpose of the additional intrusion is " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19, 88 S.Ct. at 1878 (quoting *Warden v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782 (1967) (Fortas, J., concurring)).

The record in this case discloses that Officer Spitzmiller had a dual purpose in conducting a pat-down search of the defendant. He made the search not only to protect himself from danger, since he had previously encountered armed suspects under similar circumstances, but also to recover any narcotics from the defendant before they might be destroyed. *Terry* expressly holds, however, that the sole justification for a pat-down search is the "protection of the police officer and others nearby." 392 U.S. at 29, 88 S.Ct. at 1884. Because Officer Spitzmiller's right to conduct a pat-down search was thus limited to neutralizing any risk of physical harm to himself or others at the time, the officer's additional purpose in preventing the destruction of any drugs could not serve as an independent basis for the frisk. Nevertheless, Officer Spitzmiller's concern for his own safety was adequately supported by his testimony at the suppression hearing and, in our view, did provide an objectively

reasonable basis for the self-protective frisk of the defendant incident to the investigatory stop. The district court, therefore, erred when it failed to consider the objective circumstances that justified a protective search for a weapon and, instead, ruled the frisk unreasonable solely on the basis of the officer's statement of subjective intent or purpose.

### 3.

The third condition for a limited intrusion into personal privacy or security is whether the scope and character of the intrusion are reasonably related to its purpose. *E.g., Hughes,* 767 P.2d 1201; *Melgosa,* 753 P.2d 221; *Tate,* 657 P.2d 955. As previously discussed, the only purpose which the law countenances for such an intrusion is the protection of the officers and others during the course of an investigatory stop. *E.g., Terry,* 392 U.S. at 29, 88 S.Ct. at 1884; *Sherman* 197 Colo. 442, 593 P.2d 971; *Navran,* 174 Colo. 222, 483 P.2d 228, § 16–3–103(2), 8A C.R.S. (1986). In the instant case, the scope and character of the intrusion, as reflected by the unrebutted testimony of the record, consisted of Officer Spitzmiller's act of opening the lid of the plastic vial and examining its contents. Although the district court, in ruling on the motion to suppress, did not specifically conclude whether the scope and character of this intrusion was reasonably related to its purpose, we are satisfied from the undisputed testimony of Officer Spitzmiller that his examination of the contents of the vial exceeded the constitutionally permissible limits of a protective search for a weapon during an investigatory stop.

When a pat-down search provides a police officer with an indication that the suspect has on his person an object that might be a weapon, the officer has the right to remove the object from the suspect and make a cursory visual or "plain view" examination of it in order to determine whether it is a weapon or other dangerous instrument that could jeopardize the safety of the officer or others during the course of the investigatory stop. *E.g., Melgosa,*

753 P.2d at 226; *Sherman,* 197 Colo. at 444, 593 P.2d at 972; *Navran,* 174 Colo. at 227–29, 483 P.2d at 231–32. Where, however, the object recovered from a suspect proves to be a closed container, the officer may not open the container to examine its contents unless he can point to specific and articulable facts supportive of a reasonable suspicion that the closed container poses a danger to himself or others nearby. This rule finds support in the prior decisions of this court, as well as in the decisions of other courts, which have addressed the constitutional limits of a *Terry*-type search under circumstances analogous to those present here. *See Sherman,* 197 Colo. 442, 593 P.2d 971 (although police officer had valid basis for stopping defendant and three other youths carrying beer bottles, officer had no valid basis for frisking the defendant and seizing a plastic bag containing illegal drugs, since there was no reasonable basis for suspecting the defendant was armed); *Navran,* 174 Colo. 222, 483 P.2d 228 (plastic bag of marijuana seeds and cigarette papers properly suppressed where such objects were seized from the defendant's person during an investigatory stop and no showing made that officers were conducting protective search for weapon); *People v. Collins,* 1 Cal.3d 658, 83 Cal.Rptr. 179, 463 P.2d 403 (1970) (even if initial detention of defendant was lawful investigatory stop, officer's feel of soft object in defendant's pocket did not justify seizure of object, which proved to be a plastic bag of marijuana, since officer unable to point to specific facts justifying intrusion into defendant's pocket); *People v. Pritchett,* 75 Ill.App.3d 127, 30 Ill.Dec. 810, 393 N.E.2d 1157 (1979) (where officer in course of investigatory stop determined that bulge in defendant's pocket was tobacco or similar substance, officer not justified in seizing and opening object, since he no longer had reasonable basis to believe that suspect was armed or dangerous); *Commonwealth v. Silva,* 366 Mass. 402, 318 N.E.2d 895 (1974) (where protective search of defendant and his car produced no weapon, seizure and opening of soft packet, which could not conceivably contain a gun, was unlawful, and heroin found in packet

properly suppressed); *People v. Roth,* 66 N.Y.2d 688, 496 N.Y.S.2d 413, 487 N.E.2d 270 (1985) (where officer in course of frisk removed from defendant's jacket pocket an object which turned out to be gambling records, officer not justified in seizing and examining papers, since fear for officer's safety had abated); *Neal v. State,* 696 P.2d 508 (Okla.Crim.App.1985) (warrantless search of contents of medicine bottle taken from defendant's coat jacket was unlawful, since officer had no reason to suspect that defendant was armed or dangerous); *State v. Allen,* 93 Wash.2d 170, 606 P.2d 1235 (1980) (where frisk established that bulge in defendant's pocket was wallet, officer exceeded permissible bounds of frisk by looking inside wallet); *see also* 3 W. La-Fave, *Search and Seizure* § 9.4(d), at 525–26 (2d ed. 1987).

In this case, Officer Spitzmiller clearly had the right to remove the "large solid object" from the defendant's pocket in order to determine what the object was. The officer also had the right to make a cursory visual examination of the object to assure himself that it did not pose a threat to him or others. Officer Spitzmiller acknowledged in his suppression testimony that, upon reviewing and identifying the object as an opaque plastic vial covered with duct tape, he did not feel threatened by the vial, but that he nonetheless flipped open its lid and looked inside in order to determine its contents, and that he would have made such an examination before returning it to the defendant regardless of what the object was. We conclude that, in the absence of evidence to support a reasonable suspicion that the contents of the plastic vial posed a threat to the safety of Officer Spitzmiller or others during the investigatory stop, Officer Spitzmiller exceeded the limits of a constitutionally permissible protective search by opening the vial and examining its contents.

We are not unmindful of an officer's legitimate concern for his own safety and the safety of others during a temporary stop. We believe, however, that the protective weapons search authorized by *Terry* and its progeny adequately addresses that concern. To permit an officer to open and examine the contents of a sealed container seized from a suspect during an investigatory stop, where, as here, the officer has no reasonable basis for suspecting that the container poses a danger to himself or others nearby, would totally eviscerate the constitutional limitations which the United States Supreme Court has placed on limited intrusions into personal privacy or security on less than probable cause.

We accordingly affirm the suppression ruling of the district court.

ROVIRA, J., dissents, and VOLLACK, J., joins in the dissent.

ROVIRA, Justice, dissenting:

The majority correctly delineates the criteria which must be applied to determine whether the police had probable cause to arrest the defendant. As stated, probable cause to arrest "is not to be measured by a 'more likely true than false' level of certitude but by a common-sense, nontechnical standard of reasonable cause to believe, with due consideration being given to a police officer's experience and training in determining the significance of his observations to the ultimate issue of probable cause." Majority op. at 1375. I believe that the majority's analysis applies the probable cause criteria in an overly technical manner which provides little guidance for police officers and denies them fair leeway in enforcing the law for the community's protection. I also disagree with the majority's conclusion that Officer Spitzmiller's actions were not justified as being within the scope of a proper search pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

I.

As the majority indicates, "[p]robable cause is a fact-specific inquiry that must be resolved on the basis of the totality of circumstances." Majority op. at 1377. Seldom does a decision in one case handily dispose of the next. *United States v. Davis,* 458 F.2d 819, 821 (D.C.Cir.1972). The richness and variety of street encounters in which law enforcement officers are

involved necessitates that the probable cause determination be based upon "a common-sense, nontechnical standard of reasonable cause to believe." *People v. Melgosa,* 753 P.2d 221, 225 (Colo.1988).

When viewed in isolation, the discrete acts of the defendant are not dispositive and could be rationalized as involving only "suspicious behavior." The defendant's actions, however, are not independent. When viewed in their entirety, the individual acts fit together like pieces of a puzzle, and provide a reasonable basis for concluding that a drug transaction has taken place. *See United States v. Davis,* 458 F.2d 819 (D.C.Cir.1972).

Detective Turner, a narcotics officer with many years of experience, observed the defendant as he left the Cloud Nine Bar, located in an area known for its high level of drug activity. The defendant then contacted Ernest Walker, a known seller and user of drugs, who was standing in the bar's parking lot. Walker and the defendant proceeded to the side of the building together. While attempting to hide their actions they engaged in a "hand to hand" transfer of a small object. Turner, believing that he had observed a drug transaction, radioed for assistance from uniformed officers.

When Officers Spitzmiller and McDonald entered the parking lot in a marked police car, the defendant immediately began to move away from Walker. Spitzmiller, who is a veteran police officer and defensive tactics instructor, stopped the defendant and conducted a *Terry* type frisk.

Through his verbal and nonverbal actions, the defendant exhibited his dismay at the impending discovery of the duct taped vial he possessed.[1] The significance of the defendant's actions could easily have been overlooked by a casual observer. Spitzmiller, however, because of his training and experience as a police instructor, found this behavior to be highly probative. *See People v. Hughes,* 767 P.2d 1201 (Colo.1989) (defendant's dropping of his arm and head

during a *Terry* search involved furtive movement). He recognized the defendant's behavior as being "a key ... [indicating] that there was something in there he didn't want me to find." Immediately thereafter he discovered a hard object in the defendant's pocket. The object turned out to be a vial, wrapped in duct tape, which effectively concealed the container's contents.

Spitzmiller, as the majority acknowledges, was justified in performing a *Terry* type stop and frisk of the defendant. Facts discovered as a result of such an encounter may provide probable cause to support a custodial arrest. *Hughes,* 767 P.2d at 1207; *Melgosa,* 753 P.2d at 228; *People v. Tate,* 657 P.2d 955, 959 (Colo. 1983). The defendant's conduct during the *Terry* stop and the discovery of the vial indicated that his prior activities were more than merely "suspicious." *See Robles v. State,* 510 N.E.2d 660 (Ind.1987) (defendant's suspicious actions provided law enforcement officials with probable cause to open two small packages wrapped in duct tape); *State v. Buckley,* 426 So.2d 103 (La. 1983) (police observation of a suspicious transfer provided them with probable cause to search defendant's purse); *see also United States v. Green,* 670 F.2d 1148 (D.C.Cir.1981) (officer's observation of a suspicious transfer involving currency and a concealed object provided probable cause to search); *United States v. White,* 655 F.2d 1302 (D.C.Cir.1981) (probable cause to search found where, in a high narcotics area, police observed a transaction involving a small object and currency).

The discovery of the vial, when considered in conjunction with the events which transpired after the defendant left the Cloud Nine Bar, provided Spitzmiller with a reasonable basis to believe that the defendant had been involved in a drug transaction. Therefore, examination of the vial's contents by Officer Spitzmiller was permitted as a search incident to a valid custodial arrest of the defendant. *E.g., United States v. Robinson,* 414 U.S. 218,

---

1. When Officer Spitzmiller came to the pocket in which the vial was found, the defendant dropped his head, saying "Geez."

94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *People v. Bischofberger,* 724 P.2d 660 (Colo.1986).

The court in *United States v. Davis,* 458 F.2d 819, 821 (D.C.Cir.1972), noted:

> A significantly lower *quanta* of proof is required to establish probable cause than guilt. Probable cause does not emanate from an antiseptic courtroom, a sterile library or a sacrosanct adytum, nor is it a pristine "philosophical concept existing in a vacuum," but rather it requires a pragmatic analysis of "everyday life on which reasonable and prudent men, not legal technicians act." It is to be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training.

(Citations omitted.)

An overly technical application of the probable cause criteria frustrates legitimate law enforcement activity, without appreciably furthering a citizen's interest in being protected from "rash and unreasonable interferences with [their] privacy." Law enforcement officers must be given "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

Under the circumstances present here, I believe there was probable cause to support a custodial arrest of the defendant, and, accordingly, would reverse the order of suppression. Finding there was probable cause to arrest ends the inquiry, but in light of the majority's analysis of the investigatory stop, I will also consider this issue.

## II.

I agree with the majority's conclusion that the police had a specific and articulable basis in fact for suspecting that the defendant had or was engaging in a criminal act, and that the purpose of the intrusion was reasonable. I disagree with the conclusion that Officer Spitzmiller's act of opening and examining the contents of the vial exceeded the limits of a constitutionally protected search. Under *Terry,* he would have been justified in opening the container if he had an objectively reasonable basis for believing that it contained some type of weapon. A *Terry* type search "will be upheld on the basis of its objective reasonableness even though the officer may have harbored a subjective intent to engage in a more extensive intrusion than was otherwise warranted under the circumstances." [2] Majority op. at 1377.

Spitzmiller testified that on prior occasions he had recovered "side arms, weapons, knives, razor blades, and handguns" from suspects who had been contacted in the parking lot of the Cloud Nine Bar. The three-inch long, one and one-half inch wide, and one-half inch thick duct taped vial which the defendant possessed could have contained, among other things, a small knife or a razor blade.

The officer's search of the vial was within the permissible scope of a *Terry* search because there was an objectively reasonable basis for concluding a weapon might be found. *See Taylor v. Superior Court,* 275 Cal.App.2d 146, 79 Cal.Rptr. 677 (1969) (proper to open Zippo-type cigarette lighter because it could contain razor blades); *State v. Campbell,* 53 N.J. 230, 250 A.2d 1 (1969) (proper to open an envelope which "might well have contained a weapon such as a thin knife or blade"); *see also United States v. Simmons,* 567 F.2d 314 (7th Cir. 1977) (search of small bag justified as a valid *Terry* search); *United States v. Vigo,* 487 F.2d 295 (2d Cir.1973) (search of closed handbag within limits of permissible search).

Accordingly, I would reverse the order of the trial court.

I am authorized to say that Justice VOLLACK joins me in this dissent.

---

**2.** As the majority indicates, "an officer's subjective intent is a relevant factor for a court to consider in determining the purpose of the intrusion ... it is [however] *by no means determinative of the issue ...*." Majority op. at 1377 (emphasis added).